**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**

**UNITED STATES OF AMERICA**

        **vs.**                           **CASE NO: 8:19-cr-324-CEH-SPF**

**DIORVIS CORDOVA REYES**

**DEFENDANT DIORVIS CORDOVA REYES'**
**SENTENCING MEMORANDUM AND MOTION FOR VARIANCE**

Defendant, Diorvis Cordova Reyes, through counsel, hereby files this Sentencing Memorandum in advance of his sentencing and respectfully moves for a variance from the United States Sentencing Guidelines. Mr. Cordova Reyes pleaded guilty to Count I of the Indictment charging conspiracy to possess with the intent to distribute five (5) kilograms or more of a controlled substance, while onboard a vessel subject to the jurisdiction of the United States, in violation of Title 46 U.S.C. §§ 70503(a), 70506(a) and b, and 21 U.S.C. § 960(b)(1)(B)(ii).

## I. INTRODUCTION

Mr. Cordova Reyes is scheduled for an in-person sentencing before this Honorable Court on May 26, 2020 at 11:30 a.m. The Presentence Report ("PSR") as calculated results in a guideline score of 33 with a guideline range of 135 to 168 months of imprisonment. Counsel for Mr. Cordova Reyes objects to an USSG §2D1.1(b)(1) enhancement of two additional offense levels for possessing a dangerous weapon. Mr. Cordova Reyes seeks a variance based upon his personal circumstances and the facts of his case.

## II.    PERSONAL BACKGROUND AND RELEVANT HISTORY

Mr. Cordova Reyes is a citizen of Venezuela, born to working class parents who welcomed his birth. In 2014, after his father was diagnosed with prostate cancer, Mr. Cordova Reyes became the sole source of income for his family. Prior to being his family's only source of income, Mr. Cordova Reyes began working at a very young age. From fourth grade to sixth grade, Mr. Cordova Reyes worked in carpentry. He also began selling fish. Mr. Cordova Reyes would attend school in the morning and then work until 6:00 p.m., selling fish in his local town that he purchased from a fishmonger in a port located approximately two and a half hours away from his home. He worked selling fish until he was robbed, and thereafter, concerned for his safety, began working on a cocoa plantation, where he worked for three months until he was arrested and charged in this case.

Despite his ability to provide for his family, Mr. Cordova Reyes' success never rose above the level of providing basic economic needs, such as food, clothing, and shelter. For approximately six months, Mr. Cordova Reyes was able to attend college, and studied literature. However, he had to disenroll when he became unable to financially afford his studies. Mr. Cordova Reyes has never lived in a living environment that could be described as luxurious, and planned to use any proceeds from his criminal activity to pay for his younger brother to attend college. Since his arrest, Mr. Cordova Reyes' family has suffered financially and emotionally since his arrest, and has not had a consistent source of income to provide for their day-to-day needs.

With regards to his current criminal charge, on or about July 31, 2019, Mr. Cordova Reyes and six others were interdicted by the United States Coast Guard onboard a vessel in international waters, and were subsequently found to possess over one hundred kilograms of cocaine. [ECF No. 1, 80] Mr. Cordova Reyes was detained, and thereafter arrested on August 8, 2019. [ECF No. 13] On January 2, 2020, Mr. Cordova Reyes pleaded guilty to Count One of the Indictment pursuant to a plea agreement. [ECF No. 80, 166]

**SENTENCING GUIDELINES**

The PSR, applying the 2018 Guidelines Manual, calculated a total offense level of 33 resulting in an advisory range of 135-168 months of incarceration.  Mr. Cordova Reyes' criminal history category is 1.  He received a two-level reduction for acceptance of responsibility.

**III.   MOTION FOR VARIANCE**

Due to Mr. Cordova Reyes' personal history and circumstances, he respectfully requests that this Court impose a sentence below his advisory guideline range. As this Honorable Court is well aware, a United States District Court is no longer limited by the guidelines since the matrix is merely considered advisory. United States v. Booker, 543 U.S. 220, 245-267 (2005).  The United States Supreme Court in Booker gave judges the flexibility to use the sentencing range produced by the Guidelines as a "starting point" or "initial bench mark."  Gall v. United States, 552 U.S. 38, 49 (2007).

Moreover, in United States v. Talley, 431 F.3d 784 (11th Cir. 2005), the Eleventh Circuit adopted a two-step procedure that district courts should follow when

fashioning a sentence in the post-Booker, advisory Sentencing Guidelines era. "First, the district court must consult the Guidelines and correctly calculate the range provided by the Guidelines." Id. at 786. Second, the district court must consider the following ten factors: 1) the nature and circumstances of the offense and the history and characteristics of the defendant; 2) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; 3) the need for deterrence; 4) the need to protect the public; 5) the need to provide the defendant with needed educational and vocational training or medical care; 6) the kinds of sentences available; 7) the Sentencing Guidelines range; 8) pertinent policy statements of the Sentencing Commission; 9) the need to avoid unwarranted sentencing disparities; and (10) the need to provide restitution to the victims. Id. See also 18 U.S.C. §3553(a). "The weight to be accorded any given §3553(a) factor is a matter committed to the sound discretion of the district court." United States v. Williams, 456 F.3d 1353, 1363 (11th Cir. 2006).

In the instant case, Mr. Cordova Reyes cooperated in the investigation and was truthful in his discussions with law enforcement. Mr. Cordova Reyes took responsibility for his actions and pleaded guilty to Count One of the Indictment. Mr. Cordova Reyes also cooperated in a manner that counsel for Mr. Cordova Reyes will address in person with this Honorable Court.

Also, it is appropriate, and counsel for Mr. Cordova Reyes requests, a downward variance pursuant to the defendant's family ties and responsibilities. Mr. Cordova Reyes' was the sole financial source of income for his family, and since his

arrest their quality of life has suffered due to their loss of his income. A lengthy sentence of imprisonment will cause a substantial, direct, and specific loss of essential financial support to Mr. Cordova Reyes' family.

Further, Mr. Cordova Reyes is from Venezuela, which is currently a country of economic crisis and civil unrest. The Government of the United States established diplomatic relations with Venezuela in 1835. Those relations became strained during the 1999-2013 presidency of Hugo Chavez. During his presidency, President Chavez' policies to seize private property and restrict media freedom eroded democratic checks and balances, while cooperation with criminal and terrorist groups as well as facilitation of activities by extra-hemispheric actors such as China, Russia, and Iran increased tensions.[1] In 2013, Nicolas Maduro was "elected" as president, and then "reelected" in May of 2018. His reelection led the United States and 53 other countries to recognize National Assembly President, Juan Guaiado, as the constitutional interim President of Venezuela.[2] Beginning in 2017, prior to Maduro's reelection, the United States instituted over 150 Venezuelan-related designations, pursuant to the Foreign Narcotics Kingpin Designation Act,[3] the International Emergency Economic Powers Act,[4] and various Executive Orders[5] in an effort to pressure the Maduro regime

---

[1] U. S. Relations with Venezuela, at https://www.state.gov/u-s-relations-with-venezuela/
  (July 8, 2019) (last visited May 19, 2020).
[2] *See Id.*
[3] 21 U.S.C. 24 § 1901-1908 and 8 U.S.C. § 1182. For example, former Vice
  President/current Foreign Minister Tareck Zaidan El Aissami Maddah was charged with
  violations of the Foreign Narcotics Kingpin Designation Act in *United States v. Coro et al*, 1:19-
  cr-144.
[4] 50 U.S.C. 35 § 1701-1707.
[5] See, for example, E.O. 13692, Blocking Property and Suspending Entry of Certain Persons

to stabilize the country.[6] On March 11, 2019, the U.S. Department of State announced the withdrawal of diplomatic personnel from the U.S. Embassy in Caracas, Venezuela.[7] All consular services, routine and emergency, were, and remain, suspended.[8] There are shortages of food, electricity, water, medicine, and medical supplies throughout much of Venezuela.[9] On December 2, 2019, the U.S. Department of State issued a Level Four travel advisory urging American citizens not to travel to the country,[10] describing Venezuela as a country with widespread violence or organized crime with limited ability for local law enforcement to respond to serious crimes, having political, religious, and/or ethnic instability that may cause violence, major disruptions, and/or safety risks, and that criminal or terrorist individuals or

---

Contributing to the Situation in Venezuela, (Mar. 5 2019) at https://www.govinfo.gov/app/details/CFR-2016-title3-vol1/CFR-2016-title3-vol1-eo13692/context; E.O. 13808, Imposing Additional Sanctions With Respect to the Situation in Venezuela, (August 24, 2017), at https://www.treasury.gov/resource-center/sanctions/Programs/Documents/13808.pdf.

[6] U. S. Relations with Venezuela, at https://www.state.gov/u-s-relations-with-venezuela/ (July 8, 2019) (last visited May 19, 2020).

[7] Venezuela Travel Advisory, at https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/venezuela-travel-advisory.html (last visited May 19, 2020).

[8] *Id.*

[9] *Id.*

[10] Level 4 – Do Not Travel: This is the highest advisory level due to greater likelihood of life-threatening risks. During an emergency, the U.S. government may have very limited ability to provide assistance. The Department of State advises that U.S. citizens not travel to the country or to leave as soon as it is safe to do so. The Department of State provides additional advice for travelers in these areas in the Travel Advisory Conditions in any country may change at any time, available at https://travel.state.gov/content/travel/en/international-travel/before-you-go/about-our-new-products.html (last visited May 19, 2020).

groups have threatened to and/or have seized or detained and threatened to kill, injure or continue to detain individuals in order to compel others to take a desired action.[11]

While it does not justify Mr. Cordova Reyes' role in the conspiracy, the state of the country of Venezuela and the comparison of its citizens quality of life to those enjoyed by typical Americans does provide perspective and context to Mr. Cordova Reyes' need to financially support his family as the sole financial income, and the impetus for his criminal activity; again, Mr. Cordova Reyes' motivation to become involved in the drug trafficking conspiracy was to allow his younger brother to earn a higher education.

## IV.    OBJECTION TO ENHANCMENT

Additionally, counsel for Mr. Cordova Reyes objects to an USSG §2D1.1(b)(1) enhancement of two additional offense levels for possessing a dangerous weapon. The evidence and statements of co-defendants do not support a two offense level enhancement; counsel for the United States even describes the evidence as "murky" and *potentially* sufficient. Counsel for the United States is not equivocally seeking the enhancement, and the evidence is insufficient to meet the standard of a preponderance of the evidence, and therefore should not be applied.

---

[11] Department of State Venezuela Travel Advisory, available at https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/venezuela-travel-advisory.html (last visited May 19, 2020).

## V.    CONCLUSION

Mr. Cordova Reyes respectfully requests this Honorable Court grant his motion for a variance, sustain counsel for Mr. Cordova Reyes' objection to a two-level enhancement due to weak evidence supporting the dangerous weapon (firearm) enhancement, and consider Mr. Cordova Reyes safety-valve eligible. Should Mr. Cordova Reyes be safety-valve eligible, his offense level would be calculated at offense level 29, and his sentencing guideline range would be 87 to 108 months.

Based on the circumstances set forth above, it is respectfully suggested that this Honorable Court impose a sentence below the sentencing guideline range.

DATED this 19th day of May, 2020.

Respectfully submitted,


_____/s/ Rebecca L. Castaneda_____
Rebecca L. Castaneda
Florida Bar No. 1007926
rc@attorneyrebeccacastaneda.com
The Castaneda Law Firm PLLC
506 N. Armenia Avenue
Tampa, Florida 33609-1703

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been electronically filed on May 19, 2020, with the Clerk of the Court using the CM/ECF system which will automatically transmit an electronic copy to:

**AUSA Nicholas DeRenzo**

By:     */s/ Rebecca L. Castaneda*
        Rebecca L. Castaneda
        Florida Bar No. 1007926
        rc@attorneyrebeccacastaneda.com
        The Castaneda Law Firm PLLC
        506 N. Armenia Avenue
        Tampa, Florida 33609-1703